HARASYN ET AL., APPELLANTS, *v.* NORMANDY METALS, INC., APPELLANT; FIREMAN'S FUND INSURANCE COMPANY OF OHIO, APPELLEE.

[Cite as Harasyn *v.* Normandy Metals, Inc. (1990), 49 Ohio St. 3d 173.]

(No. 88-1700—Submitted November 8, 1989—Decided March 7, 1990.)

*Joseph L. Coticchia Co., L.P.A.,* and *Joseph L. Coticchia,* for appellants Dick and Louella Harasyn.

*Petro, Rademaker, Matty & Mc-Clelland, Robert C. McClelland* and *James M. Petro,* for appellant Normandy Metals, Inc.

*Crabbe, Brown, Jones, Potts & Schmidt, Steven B. Ayers* and *Jeffrey M. Lewis,* for appellee Fireman's Fund Insurance Co. of Ohio.

*Dinsmore & Shohl* and *George B. Wilkinson,* urging reversal for *amicus curiae,* Cincinnati Die Casting Co.

*Vorys, Sater, Seymour & Pease,*

Russell P. Herrold, Jr., and Robert A. Minor, urging reversal for amicus curiae, Ohio Manufacturers' Association.

Dinsmore & Shohl and Mark A. VanderLaan, urging reversal for amicus curiae, Quantum Chemical Corp.

Harris, Bella & Burgin, Jerald D. Harris and Barry R. Levy, urging reversal for amicus curiae, Ohio Academy of Trial Lawyers.

H. BROWN, J. In this case, we must decide whether public policy prohibits an employer from insuring against tort claims by employees in cases where the employer did not intend to injure the employee but knew that injury was substantially certain to occur. For the reasons which follow, we find that it does not.

## I

We begin our discussion with an analysis of the nature of employer intentional torts. In Van Fossen v. Bab-cock & Wilcox Co. (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489, paragraphs five and six of the syllabus, we adopted, in effect, the definition of an "intentional tort" contained in 1 Restatement of the Law 2d, Torts (1965) as the law of Ohio. Under this standard, an intentional tort occurs when "* * * the actor desires to cause consequences of his act, or * * * he believes that the consequences are substantially certain to result from it." 1 Restatement of the Law 2d, Torts (1965) 15, Section 8A. This definition encompasses two different levels of intent. The first level, which we will refer to as "direct intent," is where the actor does something which brings about the exact result desired. In the second, the actor does something which he believes is substantially certain to cause a particular result, even if the actor does not desire that result.[1]

It appears that most employer intentional torts, including the claim pled in the instant case, fall into the latter category.[2] Where the employer's al-

---

[1] In criminal law, these two levels of intent are treated as distinct mental states. What we refer to as "direct intent" is similar to the culpable mental state of "purposeful" in R.C. 2901.22(A). What we refer to as "substantially certain" is similar to the culpable mental state existing when a person acts "knowingly" in R.C. 2901.22 (B).

[2] See, e.g., Schump v. Firestone Tire & Rubber Co. (1989), 44 Ohio St. 3d 148, 541 N.E. 2d 1040 (allegation that employer knew failure of tire was substantially certain to occur); Hunter v. Shenango Furnace Co. (1988), 38 Ohio St. 3d 235, 236, 527 N.E. 2d 871, 872 (allegation that employer "allowed a condition to exist * * * that was substantially likely to cause injury * * *"); Kunkler v. Goodyear Tire & Rubber Co. (1988), 36 Ohio St. 3d 135, 136, 522 N.E. 2d 477, 478 (intentional tort alleged where employer told employee to operate machine despite danger of explosion); Pariseau v. Wedge Products, Inc. (1988), 36 Ohio St. 3d 124, 125, 522 N.E. 2d 511, 512-513 (employer alleged to have known that safety device on punch press was malfunctioning); Jones v. VIP Development Co. (1984), 15 Ohio St. 3d 90, 95-96, 15 OBR 246, 250-251, 472 N.E. 2d 1046, 1051-1052 (two consolidated cases: [1] alleged failure to warn employees of presence of dangerous condition, [2] alleged removal of safety device from coal chute); but, see, Jones, supra, at 91-92, 15 OBR at 247, 472 N.E. 2d at 1049 (the third consolidated case alleged deliberate misrepresentation by employer of health effects of acid fumes); Blankenship, supra, at 608-609, 23 O.O. 3d at 505, 433 N.E. 2d at 574 (alleged deliberate misrepresentation by employer of health effects of chemicals used in workplace).

leged tortious actions were not taken with deliberate intent to injure the employee, and where the damages sought are to compensate for injury rather than to punish wrongdoing, the public policy argument for depriving the employer of insurance protection is not compelling.

All liability insurance protects the tortfeasor from economic loss resulting from legal liability. Prosser & Keeton, The Law of Torts (5 Ed. 1984) 585, Section 82 ("Prosser"); Keeton & Widiss, Insurance Law (1988) 517, Section 5.4(c)(5) ("Keeton"). At one time, liability insurance was attacked on public policy grounds "as an encouragement to antisocial conduct and a relaxation of vigilance toward the rights of others, by relieving the actual wrongdoer of liability. * * *" Prosser, *supra,* at 585, Section 82. As tort law evolved toward an emphasis on victim compensation, *id.* at 7, Section 2, and "it became apparent that no dire consequences in fact resulted," *id.* at 586, Section 82, public policy came to favor liability insurance for negligent acts as a means of assuring that innocent persons are made whole. This policy of assuring victim compensation has been extended to "wanton" and "reckless" torts. Keeton, *supra,* at 524-525, Section 5.4(d)(3).

It is often said that public policy prohibits liability insurance for intentional torts. Keeton, *supra,* at 519, Section 5.4(d)(1). This statement is based on "the assumption that such conduct would be encouraged if insurance were available to shift the financial cost of the loss from the wrongdoer to his insurer. * * *" Farbstein & Stillman, Insurance for the Commission of Intentional Torts (1969), 20 Hastings L.J. 1219, 1245-1246. However, this blanket prohibition "makes no distinctions as to the various forms of intentional wrongdoing and does not admit the possibility that some torts might not be particularly encouraged if insurance were available for them." *Id.* at 1251. The better view is to prohibit insurance only for those intentional torts where "the fact of insurance coverage can be related in some substantial way to the commission of wrongful acts of that character. * * *" *Isenhart* v. *General Cas. Co.* (1962), 233 Ore. 49, 52-53, 377 P. 2d 26, 28; Farbstein & Stillman, *supra,* at 1251-1253. In the case of a "direct intent" tort, the presence of insurance would encourage those who deliberately harm another. In torts where intent is inferred from "substantial certainty" of injury, the presence of insurance has less effect on the tortfeasor's actions because it was not the tortfeasor's purpose to cause the harm for which liability is imposed. See *Indiana Lumbermens Mut. Ins. Co.* v. *Brandum* (Ind. App. 1981), 419 N.E. 2d 246, 248. In the latter situation, the policy of assuring victim compensation should prevail.[3]

---

[3] The consent judgment in the instant case appears to be for compensatory damages only. Punitive damages are therefore not at issue. It should be noted, however, that because punitive damages are awarded to punish and deter the tortfeasor rather than to compensate the victim, see *Detling* v. *Chockley* (1982), 70 Ohio St. 2d 134, 24 O.O. 3d 239, 436 N.E. 2d 208, there is a different and much stronger public policy interest against insurance coverage which would indemnify the tortfeasor against punitive damages. *State Farm Mut. Ins. Co.* v. *Blevins* (1990), 49 Ohio St. 3d 165, 551 N.E. 2d 955; Prosser, *supra,* at 13, Section 2; see, also, Farbstein & Stillman, *supra,* at 1252 (treble-damage remedies would lose their deterrent effect if indemnity were allowed).

The General Assembly, implicitly by its enactment of R.C. 4121.80 in 1986, made a sweeping declaration of public policy in this area. Division (E) of the statute establishes a statewide insurance fund, to be administered by the Industrial Commission, which pays *all* claims arising out of employer intentional torts (whether the intent is found to be "direct" or "substantially certain"). See R.C. 4121.80(B) and (G)(1). Whatever the wisdom of this enactment,[4] it is an expression by the public's elected representatives that such insurance is not against public policy.[5]

In other states, legislative enactments fund an employer's exposure to intentional torts at the "substantially certain" level. Such torts are covered by statutory workers' compensation, leaving the employee free to sue the employer at common law only for "direct intent" torts. See, *e.g.,* *Mingachos* v. *CBS, Inc.* (1985), 196 Conn. 91, 491 A. 2d 368; *Sullivan* v. *Liberty Mut. Ins. Co.* (Fla. App. 1979), 367 So. 2d 658, certiorari denied (Fla. 1979), 378 So. 2d 350; *Provo* v. *Bunker Hill Co.* (D. Idaho 1975), 393 F. Supp. 778; *Collier* v. *Wagner Castings Co.* (1980), 81 Ill. 2d 229, 408 N.E. 2d 198; *Hildebrandt* v. *Whirlpool Corp.* (Minn. 1985), 364 N.W. 2d 394; *Noonan* v. *Spring Creek Forest Products, Inc.* (Mont. 1985), 700 P. 2d 623; *Crespi* v. *Ihrig* (1984), 99 App. Div. 2d 717, 472 N.Y. Supp. 2d 324, affirmed (1984), 63

N.Y. 2d 716, 480 N.Y. Supp. 2d 205, 469 N.E. 2d 526; *Kittell* v. *Vermont Weatherboard, Inc.* (1980), 138 Vt. 439, 417 A. 2d 926.

Accordingly, we hold that public policy does not prohibit an employer from securing insurance against compensatory damages sought by an employee in tort where the employer's tortious act was one performed with the knowledge that injury was substantially certain to occur.

## II

Fireman's argues that the Endorsement does not provide coverage for employer intentional tort claims against Normandy.

We are not persuaded. The Endorsement appears to have been written specifically for Ohio employers. By its terms, it extends coverage to "damages because of bodily injury * * * sustained by any employee of the Insured arising out of and in the course of his employment by the Insured * * *" and deletes the exclusions in the Policy. On its face, that coverage reaches the claim in this case. The Endorsement specifically excludes damages covered by statutory compensation systems such as workers' compensation, damages "on account of bodily injury to * * * any employee employed in violation of law," and assault and battery "committed by or at the direction of the Insured." Nowhere in this extensive list of de-

---

[4] One commentator has criticized the intentional tort fund created by R.C. 4121.80 as eliminating "the deterrent factor that is present when * * * [employers] are personally accountable for their actions." Comment, Intentional Torts by Employers in Ohio, the General Assembly's Solution: Ohio Revised Code Section 4121.80 (1987), 56 U. Cin. L. Rev. 247, 262. The commentator advocates basing the in-

tentional tort fund premium on the employer's record of misconduct as a means of preserving the deterrent effect of common-law damages. *Id.*

[5] We are not, by our holding in the instant case, expressing any opinion on the constitutionality of any portion of R.C. 4121.80.

tailed exclusions is there mention of employer intentional torts under *Blankenship*. If Fireman's meant to exclude employer intentional torts from its coverage, it should have said so. Further, if such coverage is excluded, the insured is left with essentially no coverage in return for the premiums paid to secure the supplemental endorsement.[6]

This case is distinguishable from *Wedge Products, Inc.* v. *Hartford Equity Sales Co.* (1987), 31 Ohio St. 3d 65, 31 OBR 180, 509 N.E. 2d 74. *Wedge* concerned a general liability policy which limited coverage to injuries "neither expected nor intended" by the employer, and specifically *excluded* coverage for claims by employees arising out of the course of their employment. *Id.* at 67, 31 OBR at 181-182, 509 N.E. 2d at 75-76. We held that this policy did not provide coverage for employer intentional torts. *Id.* at 67, 31 OBR at 182, 509 N.E. 2d at 76. The policy in *Wedge* did not contain the supplemental endorsement at issue in the instant case.

For the foregoing reasons, we reverse the judgment of the court below and reinstate the judgment of the trial court ordering Fireman's to satisfy the consent judgment between Harasyn and Normandy.

*Judgment reversed.*

MOYER, C.J., SWEENEY, DOUGLAS, WRIGHT and RESNICK, JJ., concur.

HOLMES, J., dissents from the syllabus and Part I of opinion, and concurs in Part II and the judgment.

HOLMES, J., dissenting from the syllabus and Part I of opinion, and concurring in Part II and the judgment.

I must dissent from both the syllabus law of this majority opinion, and some of the commentary within the opinion. However, in light of the analysis that follows, I concur in the conclusion that there was lawful insurance coverage here, and concur in the judgment.

The majority begins its discussion of the major issue presented by setting forth, in part, the controlling definition of an "intentional tort" as contained within *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489. This quoted portion of the *Van Fossen* definition merely restated the 1 Restatement of the Law 2d, Torts (1965) 15, Section 8A, definition, *i.e.,* that "* * * the actor desires to cause consequences of his act or * * * He believes that the consequences are substantially certain to result from it." The majority opinion did not further elucidate that in *Van Fossen* we had additionally defined and limited such court-pronounced intentional torts within the workplace as follows:

"We now interpret *Jones* [v. *VIP Development Co.* (1984), 15 Ohio St. 3d 90, 15 OBR 246, 472 N.E. 2d 1046] to require knowledge on the part of the employer as a vital element of the requisite intent. Thus, under this interpretation of *Jones,* within the purview of the Restatement of Torts 2d, and the commentary of Prosser & Keeton

---

[6] At oral argument, counsel for Fireman's said that the Endorsement was designed to cover "dual capacity" tort claims, assault and battery cases, and injuries occurring to employees working out of state. The argument is specious. The En- dorsement contains no language restricting its application in this manner. Further, "dual capacity" torts appear to be covered by the basic Policy, without need of the Endorsement.

on Torts applicable to this area of law, we hold that in order for 'intent' to be found for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within his business operation; (2) knowledge by the employer that if employees are required by virtue of their employment to be subjected to such dangerous process, procedure, instrumentality or condition, then harm to them would be a substantial certainty, and not just a high risk; (3) that the employer, under such circumstances, and with such knowledge, did act to so require the employee to continue performing his employment tasks.

"We recognize that pursuant to this interpretation of 'intent' as set forth above, proof of the actual or subjective intent of the actor to accomplish the consequences is not required. Our discussion herein is directed toward significantly limiting the areas within which 'intent' on the part of the actor may be circumstantially *inferred.* [Emphasis *sic.*]

"To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. Where the risk is great and the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he

still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." *Van Fossen, supra,* at 116-117, 522 N.E. 2d at 504.

Under such definition of an "intentional tort" occurring within the workplace, the employer's knowledge of the offending conditions within which the employee is mandated to continue his work functions must be shown by the evidence. In such a situation, may it be said that the employer is only chargeable with a passive position of oversight, and that public policy would countenance such continuance of this type of activity, and his insuring against such a risk? I prefer to think not.

I believe that the majority holding implies that a *Van Fossen* type of "intentional tort" would not violate the public policy prohibition of private insurance coverage for this type of employer activity involving his employee. The majority states that to legally authorize insurance coverage to the employer for this type of tort is acceptable from a public policy standpoint because "the policy of assuring victim compensation should prevail." The majority very questionably differentiates the coverage for this type of claim from the "direct intent" tort by stating: "[i]n the case of a 'direct intent' tort, the presence of insurance would encourage those who deliberately harm another. In torts where intent is inferred from 'substantial certainty' of injury, the presence of insurance has less effect on the tortfeasor's actions because it was not the tortfeasor's purpose to cause the harm for which liability is imposed."

With this statement of public policy I cannot agree. In allowing an Ohio employer to continue to commit

an "intentional tort," as defined within *Van Fossen,* would not only be against public policy, but would be contrary to every legal understanding of a safe place within which Ohio employees may work and carry out their employment activities.

Therefore, I am unable to accept the general pronouncement of syllabus law herein that "[p]ublic policy does not prohibit an employer from securing insurance against compensatory damages sought by an employee in tort where the employer's tortious act was one performed with the knowledge that injury was substantially certain to occur."

Further, such general pronouncement of public policy in this regard was not bolstered by the legislative enactment of R.C. 4121.80 in 1986. It is true that division (E) of such statute does establish a fund to be administered by the Industrial Commission from which it may pay amounts determined by it to be warranted after a claim of intentional tort is found in favor of a claimant by a common pleas court. Such legislative enactment provides for funding of such court determinations on a statewide basis by the participating employer under workers' compensation, or the self-insured employer, and payments into such fund are based upon analysis of the employer's risk-liability history. Such fund is technically not an insurance fund and most definitely is not insurance provided by a private carrier, as we deal with here. In any event, to rely upon this legislative enactment to portray what is or is not within lawful public policy for purposes of this discussion offers little or no support for the majority's determination. This is particularly so in light of the fact that pursuant to R.C. 4121.80, in division (D), the employer must act with actual intent to occasion the injury to the employee. Such intentional tort under this definition would require conduct that is even more blameworthy and more purposeful than the conduct that *Van Fossen* has held could give rise to a common-law "intentional tort" claim. However, the lawfulness or the wisdom of R.C. 4121.80 is not before us, and I make no comment directed thereto; I only repeat that such enactment lends no valid support to the public policy question discussed herein.

Therefore, I cannot accept the majority's general endorsement of this public policy allowance for private insurance company coverage of an employer's tortious act, where the act "was one performed with the knowledge that injury was substantially certain to occur" within the meaning of "substantially certain to occur" as is set forth within *Van Fossen.* However, I am able to concur in the judgment of this case based upon the following reasoning.

In *Blankenship* v. *Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St. 2d 608, 23 O.O. 3d 504, 433 N.E. 2d 572, as further confused by *Jones* v. *VIP Development Co.* (1984), 15 Ohio St. 3d 90, 15 OBR 246, 472 N.E. 2d 1046, and its progeny, this court espoused the so-called "intentional tort" theory of acts committed by the employer against the employee within the workplace. *Jones* only defined such a tort by adoption of the definition found within 1 Restatement of the Law 2d, Torts (1965). One such definition was of course that involving "direct intent"; the other was the inferred intent arising out of the "substantially certain to occur" language of the Restatement. The outgrowth of cases within our courts was a confusing status of the law, as noted in *Van Fossen.* Courts were construing the intentional tort upon basic

negligence theories where the acts of the employer were acts of omission, or failure to warn, rather than upon the higher standard as pronounced by this court within *Van Fossen* set forth above.

Acts of the employer affecting the employee that may be classified as negligent, careless, or reckless do not rise to the level in the law, nor does the law infer that the employer actually desired to produce the result. However, trial courts, pursuant to *Blankenship* and *Jones,* were quite extensively applying the lesser standards of an inference of intent to the cases before them prior to our pronouncement in *Van Fossen.* Such state of affairs presented defendant employers throughout Ohio with a multitude of monumental judgment problems, and left them hanging at the end of the limb in a bare state.

During the period between this court's pronouncements in *Blankenship* and *Van Fossen,* many of these judgments were based upon lesser standards of negligence which would be within the legally acceptable area for possible private insurance coverage against such liability sounding in negligence. Insuring against one's negligence has of course been acceptable for many years to cover the liabilities of employers for negligently injuring others, including those injuries received by employees that may have been occasioned outside the employment.

I conclude that for this limited period during which the law of intentional torts was being equated and interpreted in the sense and standard of negligent acts, public policy did not prohibit an employer from securing insurance against compensatory damages sought by an employee for the court-established intentional tort.

Here, during the period prior to our clarifying law in *Van Fossen,* there was specific coverage offered by Fireman's Fund, accepted by Normandy Metals, and premiums paid therefor. The endorsement to the policy considered here was written and offered to Ohio industrial employers as "stop gap" coverage for these court-espoused "intentional torts" and specifically excludes assault and battery-type torts committed by the employer against the employee, and also specifically excepts injuries covered by workers' compensation.

These policies were actively promoted to Normandy and other employers, and Fireman's Fund having held out such coverage should not now be heard to deny liability upon such insurance policies sold during this period of time.

Concluding, I dissent from the syllabus law and Part I of the opinion, and I concur in Part II of the opinion and in the judgment herein.